In re GARRETT MARINE, INC., Debtor.

PAT'S FANCY, II, INC., and George F. McKiernan, Plaintiffs,

v.

Lawrence KLEINFELD, Trustee, Clipper Sales, Inc., and Key Capital Corp., Defendants.

CLIPPER SALES, INC., Plaintiff,

v.

Lawrence KLEINFELD, Trustee, Defendant.

Bankruptcy No. 84–2742–8P7.
Adv. No. 85–325.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

May 19, 1988.

Charles F. Ketchey, Jr., A. Denison Weaver, for plaintiffs Pat's Fancy, II, Inc. and George F. McKiernan.

Lawrence Kleinfeld, trustee/defendant.

Grant D. Petersen, Michael L. Gesas, for defendant Clipper Sales, Inc.

J. Eric Charlton, Richard R. Davidson, for defendant Key Capital Corp.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS the saga of a luxury yacht which, rather than ending up in a squall in the middle of the Atlantic Ocean, ended up in a very dry but heated storm in the Bankruptcy Court. This odd turn of events was the result of the financial demise of its creator, the yacht manufacturer, Garrett Marine, Inc. (Debtor), whose attempt to achieve rehabilitation under Chapter 11 failed and it ended up in Chapter 7 liquidation. The genesis of the controversy dates back to June 14, 1985 when the McKiernan Group (George F. McKiernan and Pat's Fancy II) and Clipper Sales, Inc. (Clipper Sales), both claiming to be creditors of the Debtor, filed proofs of claims in the amounts of $133,000.00. (Claim Nos. 49 and 53). The original objection to these claims was filed by the Debtor. On September 9, 1985, at the conclusion of a duly noticed hearing on the objection, this Court entered an Order and directed that the issues raised by the objection should be treated in the context of an adversary proceeding governed by Part VII of the Bankruptcy Rules.

On September 30, 1985, Pat's Fancy, II, George F. McKiernan and Patricia McKiernan filed their respective Complaints against the Debtor, Clipper Sales and Key Capital Corporation (Key Capital), the financier of a yacht which was to be built by

the Debtor for the McKiernan group. Clipper Sales, in turn, filed suit against the Debtor on October 2, 1985. These two Complaints were consolidated into this adversary proceeding presently under consideration. Following the consolidation of these proceedings, the McKiernan Group and Clipper Sales, Inc. amended their Complaints. In brief, both Complaints, as amended, allege a breach of contract based on the Debtor's failure to build and deliver a yacht. Additionally, the McKiernan Group seeks monetary damages against Key Capital and Clipper Sales. Key Capital has filed a counterclaim against the McKiernan Group for breach of contract and also has filed a cross-claim against the Debtor and Clipper Sales. The relief sought originally against the Debtor of course will be nothing more than claims against the Chapter 7 estate if ultimately found to be meritorious. The facts behind this complex dispute as established at the trial are as follows:

The Debtor, whose principal is Ben Garrett, was, at the time relevant, in the business of manufacturing sailing yachts. The yachts were marketed by Mr. Daryl Rasey, a boat broker. Sometime in 1983, Mr. Rasey, who is the sole stockholder and officer of Clipper Sales (Exhibit 32), arranged a meeting with McKiernan who had expressed an interest in buying a Garrett–40, a vessel manufactured by the Debtor. In late 1983 or early 1984, McKiernan and Rasey visited the Garrett factory and inspected the hull and deck of a Garrett–40. On February 2, 1984, Mr. Rasey prepared a Memorandum of Agreement on the letterhead of a corporation apparently affiliated with Clipper Sales and known as Harbor West of Chicago, Inc. (Harbor West). This agreement named McKiernan as purchaser of a Garrett–40 and Harbor West as the seller of the yacht. (Exhibit 27). Pursuant to this agreement, George McKiernan and his wife, Patricia, paid $3,000 as a refundable deposit to "Clipper Sales–Harbor West" [sic]. (Exhibit 28). The agreement was conditioned upon McKiernan's satisfaction with the yacht, after a test sail. The test sail occurred in May or June of 1984 and it appears that McKiernans were satisfied with the yacht.

On July 6, 1984 the McKiernans entered into an additional agreement and executed a document titled "Memorandum of Agreement" with Clipper Sales. (Exhibit 32). Under this additional agreement, Clipper Sales agreed to sell a Garrett–40 to a corporation known as "Pat's Fancy, II, Inc." The agreement identified the hull and engine of the yacht by number, and specified that the $133,000 purchase price included a "sailaway package at no charge" including fenders, dock lines, ground tackle, and a flare kit. (Exhibit 32). Although Pat's Fancy, II, Inc. was listed as the buyer of the boat, it is without dispute that the buyers in reality were to be the McKiernans, who used the corporate entity "Pat's Fancy, II" simply for registration of the yacht through the Yacht Registry, Ltd. in Wilmington, Delaware (Exhibit 47). Simultaneously, the McKiernans and Clipper Sales negotiated for extra equipment such as life preservers, winches and spinaker gear to be included in the deal. (Exhibit 29 and 30).

The July 6 Memorandum of Agreement required the delivery of the yacht by mid-August, 1984. The Agreement also called for an additional payment at closing of $100,000 from Key Capital with whom the McKiernans arranged financing of the purchase in the interim. By July of 1984, the McKiernans had paid $30,000 to Clipper Sales to serve as an additional deposit on the yacht. (Exhibit 33 and 34). It appears that after receipt of the down payment, Clipper Sales issued a check to the Debtor in the amount of $8,910.92 in order to enable the Debtor to purchase the additional items which were to be included in the deal, and a check in the amount of $250 to George McKiernan to purchase additional items for the yacht and various other checks totalling $8,946.92 again for items to be purchased to equip the yacht. (Exhibits 67–74). It appears that at the same time these agreements between Clipper Sales and the McKiernans were executed, Clipper Sales also negotiated for the purchase of the G–40 with the Debtor for $109,000. In this connection it should be

noted that the total price agreed to be paid by the McKiernans was $133,000. It is evident that the difference between the $109,000 and $133,000 was to fund the purchase of the additional equipment and to pay Clipper Sales its commission of $8,000 for arranging the sale of the yacht to the McKiernans.

Mid–August of 1984, the time the yacht was to be delivered, came and passed with no delivery of the yacht to the McKiernans. It appears that the Debtor promised the McKiernans that the yacht would be completed by the end of 1984 and that the McKiernans did in fact authorize the Debtor to use the yacht as a demonstrator until the beginning of the sailing season. The final date for delivery was fixed by agreement as April 1, 1985.

In early August, 1984, Rasey visited the Debtor's warehouse and found that the G–40 was not even close to completion and the only evidence of the yacht was a mere hull with a bulkhead and with a partially completed deck. It further appears that the only additional equipment ever purchased by the Debtor for the McKiernans was $300 to $400 worth of flotation vests, fire extinguishers and various other items to be installed on the yacht. In addition, the McKiernans received some sails obtained by Clipper Sales which, of course, had no value to the McKiernans without the G–40 and these sails were eventually returned to the manufacturer.

To further complicate matters, in order to finance the purchase of the G–40, the McKiernans, on behalf of Pat's Fancy, II, executed a Key Capital "Yacht Financing Application" (Exhibit 5) and entered into a "Marine Vessel Lease/Purchase Agreement" with Key Capital (Exhibit 12). The terms of this agreement provided that Key Capital would purchase a G–40 from Clipper Sales for the purchase price of $145,000, would lease the boat to Pat's Fancy for an initial monthly payment of $46,095.81 and thereafter at $1,095.81 per month, and that Pat's Fancy would have an option to buy the boat after all lease payments had been made to the extent of ten (10%) percent of the original purchase price

of the yacht. At the same time, both Mr. and Mrs. McKiernan executed their personal guaranties of the purchase price stipulated in the agreement by Key Capital and Clipper Sales (Exhibits 16 & 17).

Although the Marine Lease/Purchase Agreement treats the transaction as a lease, there is hardly any doubt and it is without dispute that both Key Capital and the McKiernans treated the transaction as a financed sale. In fact, Key Capital filed a UCC–1 financing statement in Delaware listing the G–40 as the collateral for the loan to Pat's Fancy. (Exhibit 18).

On July 19, 1984, a Bill of Sale was executed on behalf of Clipper Sales by Rasey naming Clipper Sales as the seller of the G–40 and Key Capital as the purchaser. (Exhibit 10). The agreed purchase price was to be $110,000, and even though the Bill of Sale named Clipper Sales as the seller, it is clear that Clipper Sales was acting merely as a broker, however, the Bill of Sale was signed by Rasey without properly identifying his status as such.

Sometime later, Key Capital's documentation service received documents on the G–40. (Exhibits 7–9). Key Capital also received a written communication from Ben Garrett on behalf of the Debtor in which it was stated "upon receipt of the wire transfer of funds to our account. We will Federal Express the Manufacturer Statement of Origin and the Builder's Certificate for Mr. George McKiernan's Garrett 40" (sic). (Exhibit 3). It is without dispute that the Builder's Certificate signed by Ben Garrett on behalf of the Debtor indicated that the G–40 was a fully completed yacht. (Exhibit 9). On August 7, 1984, Key Capital transferred by wire $100,000, the balance of the purchase price, to the account of the Debtor (Exhibit 1 and 25). This payment was made to the Debtor despite the fact that the Debtor had never had any contract with Key Capital and that the written agreement with Clipper Sales called for payment of the balance at closing to Clipper Sales. (Exhibit 32). Needless to say, a closing never took place and, as could be expected, the Debtor never returned the

funds to Key Capital or to the McKiernans or to Pat's Fancy.

Even though the McKiernans never received delivery of the yacht, let alone a title to the yacht, they made payments to Key Capital pursuant to the Marine Lease/Purchase Agreement through February, 1986 and then defaulted. At this time, the payoff on the so-called lease was $104,433.70 plus interest on the balance for 28 days at the rate of 10.5% (Exhibit 46). It is undisputed that before default, the McKiernans made payments in the total amount of $31,326.50 to Key Capital. (Exhibit 37 and 46). In addition, the McKiernans paid for insurance on the yacht and also expended funds for mooring the yacht, incurred expenses in connection with several trips to Florida and phone calls in attempting to follow up on the Memorandum Agreement. (Appendix A-3).

On November 30, 1984, the Debtor filed its Chapter 11 Petition. As may be expected by this time, the yacht was not delivered by the April 1, 1985 deadline, and the Debtor did not seek authority either to assume or reject the executory contract for the construction and the sale of the yacht.

At the time of the trial, the yacht was in the possession of Key Capital, who took possession of the G-40 hull and deck after the Debtor filed its Chapter 11 Petition and ostensively abandoned the yacht. Key Capital spent $70,976.10 for the ultimate completion and refurbishing of the yacht.

Through their eight count Complaint, the McKiernans seek relief against the Debtor, Key Capital and Clipper Sales. The claim set forth in Count I is based on an alleged breach of contract and seeks damages against the Debtor. The claim in Count II seeks declaratory relief, specifically a declaration that the McKiernans are not obligated to Key Capital under the Marine Vessel Lease/Purchase Agreement and on their personal guaranties. The claim in Count III is based on a breach of contract by Key Capital and in Count IV seeks recission of the Marine Vessel Lease/Purchase Agreement based on the contention that it fails to comply with the Retail Installation Sales and Service law of Massachusetts, Mass. Ch. 140C and 255D. The claim in Count V is based on the alleged negligence of Key Capital and seeks damages. The claim in Count VI alleges a breach of contract by Clipper Sales for its failure to deliver the G-40 to the McKiernans. The claim in Count VII seeks money damages from the Debtor's estate based on the alleged misrepresentation on the part of the Debtor by stating that the G-40 was completed or almost completed in the Builder's Certification and Manufacturer's Statement of Origin and ostensively seeks money damages. Lastly, the claim in Count VIII is based on the Debtor's alleged conversion of the funds wired from Key Capital to the Debtor and seeks money damages.

Clipper Sales, in its answer, set forth an affirmative defense alleging that it should be indemnified by the Debtor in the event it will be held liable either to the McKiernans or to Key Capital.

Key Capital also filed a second Counterclaim against Pat's Fancy alleging that under the Marine Vessel Lease/Purchase Agreement, Pat's Fancy agreed to indemnify and hold Key Capital harmless from any and all claims arising out of, connected with, or resulting from the delivery, possession, and condition of the yacht.

Next, Key Capital filed a crossclaim against Clipper Sales alleging negligent or intentional misrepresentation, a breach of express warranties as set out in the Bill of Sale, and breach of implied warranties, and breach of contract under the Bill of Sale.

Finally, Key Capital also filed a counterclaim against Lawrence Kleinfeld, Trustee of the Debtor's estate, even though Kleinfeld is a defendant and not a plaintiff in either complaint based on alleged negligent or intentional misrepresentations by the Debtor. It should be noted that on June 18, 1987, this Court entered an Order conditionally dismissing the counterclaim as no proof of claim had been filed by March 5, 1986, the bar date for filing claims in this case. The Order provided that in the event a proof of claim was filed by Key Capital, its counterclaim would be reinstated. As it

appears that no claim was ever filed, the counterclaim should stand dismissed.

Clipper Sales also filed a Complaint against Lawrence Kleinfeld, Trustee, seeking indemnification from the trustee in the event the McKiernans prevails on its claim against Clipper Sales. It also seeks damages based on breach of contract.

■ Considering first the McKiernans' claim against Key Capital, there is no question that Key Capital failed to live up to its obligations owed to the McKiernans, regardless whether the transaction between the McKiernans and Key Capital was a financing agreement or a lease. There is no dispute that the McKiernans never received the yacht. Therefore, if the transaction was really a lease, the McKiernans could not be held liable for the remainder of payments owing under the agreement for the simple reason that a lessee of chattel cannot be held liable for lease payments for a chattel purportedly leased which the lessee never received. Clearly, delivery of the personal property to be leased is the essence of a lease of personal property. If the property is never delivered to the lessee, obviously the entire transaction failed and the lessee is relieved of all liabilities under the lease. *Fla. Small Business Corp. vs. Miami Shipyards*, 175 So.2d 46 (Fla. 3d DCA 1965). On the other hand, if the transaction was a financed sale, while the McKiernans would be facially liable by virtue of their signatures on the promissory note, the total failure of consideration would be a complete deferral. It is without dispute that the McKiernans never received the $100,000, the amount stated to be the principal amount in the note which they guaranteed. The delivery of the loan proceeds to the McKiernans would be a necessity to the enforceability of the liability under the note unless the McKiernans expressly authorized Key Capital to wire the funds to the Debtor. There is nothing in this record to support this, and it is clear that the McKiernans never authorized Key Capital to wire the $100,000 to the Debtor.

Based on the foregoing, this Court is satisfied that the McKiernans are not liable to Key Capital, regardless whether that contract between them and Key Capital was a lease of the yacht or a loan to finance the purchase of the yacht. From this it follows that the McKiernans are entitled to recover all payments with interest totalling $32,202.56 already paid to Key Capital, and the McKiernans are not liable on the balance of the obligation evidenced by the promissory note either under the Lease/Purchase Agreement or on the two individual guaranties. Accordingly, the McKiernans are entitled to a judgment on Counts II, III and V of their Complaint against Key Capital and on all counts of Key Capital's Counterclaim against them which should be dismissed with prejudice. Based on the foregoing, it is not necessary to reconsider Count IV of the Complaint, which this Court already dismissed at trial.

■ Next, regarding the McKiernans' claim against Clipper Sales, this Court is satisfied that Clipper Sales breached its contract with the McKiernans. As noted earlier, Clipper Sales failed to deliver the yacht as it was obligated to do under the Memorandum Agreement. Both the February 2, 1984 Agreement (Exhibit 27) and the Memorandum Agreement of July 6, 1987 (Exhibit 32) identified Clipper–Harbor West as the seller and the McKiernans/Pat's Fancy as the buyers of the yacht. Assuming the McKiernans' relationship with Key Capital was that of borrower/lender, then the $33,000 advanced to Clipper Sales as a deposit for the yacht should be refunded to the McKiernans as the yacht was never delivered. Assuming the relationship between the McKiernans and Key Capital was that of lessee/lessor, then Clipper Sales was unjustly enriched by receipt of the $33,000. In any event, Clipper Sales should be directed to return this amount with interest to the McKiernans and judgment should be entered in favor of the McKiernans under Count VI of their Complaint.

■ Regarding the claim of the McKiernans against the Debtor, this Court is satisfied that since no evidence has been presented as to any contractual relationship between the Debtor and the McKiernans, judgment should be rendered in favor

of the Debtor and against the McKiernans under Count I. Further, this Court is satisfied that the claims set forth in Counts VII and VIII of the Complaint are equally without evidentiary support and judgment should be rendered in favor of the Debtor and against the McKiernans.

■ Key Capital seeks relief against Clipper Sales based on negligent or intentional misrepresentations, breach of warranty, and breach of contract. It appears that Clipper Sales was, at least facially, the seller of the yacht and Key Capital was the buyer. As it turned out, Key Capital is now in possession of the yacht and as of the date of the commencement of the case claimed to be the owner of the yacht. From this it follows that Key Capital should not be allowed to recover from Clipper Sales based on an alleged breach of the Bill of Sale. Further, the Court is satisfied that any damages suffered by Key Capital were not due to any misrepresentation made by Clipper Sales to Key Capital. Therefore, Key Capital's crossclaim against Clipper Sales should be dismissed.

■ This leaves for consideration the question whether the claim of Clipper Sales against the estate of the Debtor, i.e. against the Trustee, is of merit. It is without dispute that the Debtor failed to deliver a G–40 yacht pursuant to its oral agreement with Clipper Sales. However, the estate should not be held liable to Clipper Sales for $33,000 which Clipper Sales must return to the McKiernans as Clipper Sales was unjustly enriched by the receipt of the $33,000. Clipper Sales, however, should be entitled to have its claim allowed limited to the stipulated brokerage fee, as this Court is satisfied that Clipper Sales performed all its obligations which as a broker it owed to the Debtor. Further, Clipper Sales should be entitled to receive $8,910.92 which it paid to the Debtor. (Exhibit 67).

A separate final judgment will be entered in accordance with the foregoing.